# ATTORNEY'S COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MANUEL F. ZAMORA, et al )
    Plaintiffs )
                       )
                       )
vs.                   ) C.A. NO. 4:07-CV-4510
                       )
CITY OF HOUSTON and )
HAROLD HURTT, in his )
official capacity of )
Police Chief of the City )
of Houston, )
    Defendants )

**PLAINTIFF'S EXHIBIT**
**3**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

**MICHAEL DIRDEN**

MARCH 30, 2010

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION OF MICHAEL DIRDEN, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 30th day of March, 2010, from 1:10 p.m. to
4:19 p.m., before Julie M. Silhan, Certified Shorthand
Reporter in and for the State of Texas, reported by
stenographic means, at the offices of City of Houston,
Legal Department, 900 Bagby, 3rd Floor, Houston,
pursuant to Notice, the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.



REPORTING, RECORDS & VIDEO, INC.

7838 HILLMONT
HOUSTON, TEXAS 77040
713.647.5100 • FAX 713.647.5157
WWW.CAROLDAVIS.COM • 800.753.DEPO

MICHAEL DIRDEN - 3/30/2010

3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
MANUEL F. ZAMORA, et al  )
    Plaintiffs      )
                    )
vs.                 ) C.A. NO. 4:07-CV-4510
                    )
CITY OF HOUSTON and  )
HAROLD HURTT, in his  )
official capacity of  )
Police Chief of the City  )
of Houston,          )
    Defendants      )
***************************************************

ORAL DEPOSITION OF
MICHAEL DIRDEN
MARCH 30, 2010
***************************************************

ORAL DEPOSITION OF MICHAEL DIRDEN, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 30th day of March, 2010, from 1:10 p.m. to
4:19 p.m., before Julie M. Silhan, Certified Shorthand
Reporter in and for the State of Texas, reported by
stenographic means, at the offices of City of Houston,
Legal Department, 900 Bagby, 3rd Floor, Houston,
pursuant to Notice, the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

```
 1                   APPEARANCES
 2
 3    FOR PLAINTIFF:
 4       Mr. Charles Zamora
         Charles Zamora Co., LPA
 5       447 East Mound Street
         Columbus, Ohio 43215
 6       Telephone: 614/221-1300
         Fax: 614/221-6400
 7
 8    FOR DEFENDANT:
 9       Ms. Shani A. Dennis
         City of Houston, Legal Department
10       900 Bagby, 3rd Floor
         Houston, Texas 77002
11       Telephone: 832/393-6300
         Fax: 832/393-6259
12
13    ALSO PRESENT:
14       Mr. Manuel F. Zamora
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1                    INDEX
 2                                     PAGE
 3    Appearances........................3
 4    MICHAEL DIRDEN
 5       Examination by Mr. Zamora...........4
 6    Changes and signature..............92
 7    Reporter's Certificate.............94
 8
 9
10
11              EXHIBIT INDEX
12    EXHIBIT NO.      DESCRIPTION      PAGE
13    Dirden No. 1  General Order 100-06...........11
14    Dirden No. 2  Compromise and Settlement Agreement.48
15    Dirden No. 3  Compilation of Documents...........56
16    Dirden No. 4  Article on Disparate Treatment......60
17    Dirden No. 5  Memo Dated 01/09/01.................63
18    Dirden No. 6  Findings of Fact on Approval of.....64
                     Consent Decree
19
      Dirden No. 7  Article on Why Captains Don't.......90
20          Speak Up at Meetings
21
22
23
24
25
```

4

```
 1                MICHAEL DIRDEN,
 2    having been first duly sworn, testified as follows:
 3                   EXAMINATION
 4    BY MR. ZAMORA:
 5       Q.  Hello again, Chief.  My name is Chuck Zamora.
 6    I'm the attorney representing the plaintiffs in this
 7    case, Manuel Zamora and Christopher Zamora.  So before
 8    we get started, let me have you state your name on the
 9    record, please.
10       A.  Michael Anthony Dirden.
11       Q.  Okay.  Are you currently employed?
12       A.  Yes.
13       Q.  Where are you employed?
14       A.  Houston Police Department.
15       Q.  And what is your position?
16       A.  Right now I'm acting executive assistant chief
17    of police.
18       Q.  And when were you assigned to this position?
19       A.  I've been assistant chief of police since
20    April of 2004 and I was appointed to acting executive
21    chief on December 30th, 2009.
22       Q.  Who appointed you to acting assistant chief --
23    I'm sorry -- acting executive assistant chief?
24       A.  The acting chief of police, Chuck McClelland.
25       Q.  And how did you come to be appointed as acting
```

1

MICHAEL DIRDEN - 3/30/2010

5

1   executive assistant chief?
2       A. Chief of police -- the acting chief of police
3   made the selection. It was his selection entirely.
4       Q. Okay. And you mentioned earlier that you've
5   been assistant chief since April 2004. What was the
6   last assignment that you were at as an assistant chief
7   before becoming the --
8       A. The assistant chief of criminal investigations
9   command. And before that, I was the assistant chief of
10  the internal investigations command.
11      Q. Okay. As the assistant chief at the criminal
12  investigation command, what was the time period that you
13  were there?
14      A. I was there from July 1st of 2007 till
15  December 30th of 2009. And internal investigations, I
16  was there from April of 2004 until June 30th of 2007.
17      Q. Okay. And prior to being the -- an assistant
18  chief, I assume you were a captain.
19      A. No. Actually, I was a lieutenant. I was a
20  lieutenant -- actually, I was a lieutenant, called
21  lieutenant commander because I ran my own division. I
22  was a lieutenant in the auto dealers detail.
23      Q. That was your last assignment?
24      A. That was the last assignment prior to being
25  promoted to assistant chief.

6

1       Q. How long were you at the auto dealers detail?
2       A. I was in auto dealers for two and a half
3   years, somewhere from 2002 -- early 2002 to 2004.
4       Q. Okay. How did you come -- how did you become
5   an assistant chief from the lieutenant position? Is a
6   captain's test required?
7       A. No. Chief of police -- only thing that's
8   necessary to become the assistant chief is the criteria
9   specified in Chapter 143 of the Local Government Code as
10  modified by the meet and confer agreement.
11          Chapter 143.102 of the Local Government Code
12  provides that a person has to be anybody with five years
13  or more service at the Houston Police Department,
14  provided they are selected by the chief of police and
15  approved by City Council can be an assistant chief of
16  police.
17          That was subsequently modified by the meet and
18  confer agreement which now requires that you have at
19  least five years of service with the Houston Police
20  Department, have a minimum of a master's degree, and
21  again, be approved by the -- selected by the chief of
22  police and approved by the mayor.
23      Q. Okay. Were you an executive assistant chief
24  over special investigations?
25      A. No. What do you mean by over special

7

1   investigation? As the executive assistant chief over
2   the investigative operations, special investigation and
3   criminal investigations report up to me.
4       Q. Okay. Who is Captain Mark Eisenman?
5       A. Mark Eisenman is a captain who currently works
6   in the office of the chief of police. He is considered
7   to be the chief of staff for chief of police.
8       Q. Okay. Was he over crime analysis at some
9   point?
10      A. Yes, he was.
11      Q. Do you know when?
12      A. He was actually over crime analysis from I
13  believe it was May of 2004 until sometime in 2009 when
14  Chief Hurtt selected him to be the chief of staff.
15      Q. Okay. What are the general -- if you can tell
16  me, the general responsibilities of the crime analysis
17  unit?
18      A. I can't tell you. I mean, I can tell you what
19  the general responsibilities are. I know they -- the
20  crime analysis command center division, one of the
21  things they do is they perform crime analysis functions
22  for the department in terms of keeping track of crime
23  demographics, crime stats. They also supervise and
24  manage the security detail. They do research.
25      Q. What kind of research?

8

1       A. Any type of research that the department
2   requires be done. They have expertise. Some of it's --
3   at the time until recently, the crime analysis command
4   center division also included the planning and research
5   functions, so --
6       Q. Okay. What are -- or what is a uniform crime
7   report?
8       A. Uniform crime report is a crime report that is
9   promulgated pursuant to standards established by the
10  Federal Bureau of Investigations. Includes all of Part
11  1 and Part 2 crimes. It's really a combination --
12  compilation of data.
13      Q. What is a Part 1 and Part 2 crime?
14      A. Part 1 crime would be crimes that are more
15  violent in nature, such as homicide, robbery, rape.
16  Some include larceny or theft. It's what the FBI
17  considers to be Part 1 crimes and Part 2 crimes. One is
18  crimes against persons that are more serious crimes and
19  other are crimes that are considered to be less serious.
20      Q. Is there other information that can be
21  gathered from the uniform crime reports that can be used
22  by the City of Houston Police Department for such things
23  as staffing?
24      A. Information that can be gathered from the
25  uniform crime report to be used for staffing?

2

9

1    Q. Right.
2    A. I imagine that a person with an inclination
3  could use the current uniform crime report for a number
4  of things.
5    Q. Okay. I'm just trying to get an idea of
6  information that's contained within crime reports. Is
7  it -- it's statistical information?
8    A. It's primarily statistical information.
9    Q. Is there any kind of breakdown in it as far as
10  race or national origin?
11    A. In the uniform crime report itself?
12    Q. Right.
13    A. No, not as far as the recording criteria, but
14  you can probably look through the numbers and glean that
15  information if you're inclined to do so.
16    Q. Does it list, for instance, crimes per capita?
17    A. Yes, it does.
18    Q. Okay. Does it identify the ethnicity or race
19  of either --
20    A. In general, the uniform crime report as
21  promulgated in and of itself does not do that, but you
22  can use that information to get that, because it is
23  reported. It's reported to the FBI.
24    Q. Okay. Do you know what the Hispanic
25  population is in the City of Houston?

10

1    A. Not specific numbers, no, but I do know it
2  hovers around -- depending on where you look at,
3  anywhere from 36 to 40 percent, depending on the
4  numbers.
5    Q. Okay. Do you have an idea what the Hispanic
6  police officers and commanders are in the police
7  department, the percentage?
8    A. Do you mean by percentage or the number of
9  commanders?
10    Q. Let's break it down. What is the number of
11  commanders in the Houston Police Department that are
12  Hispanic?
13    A. Well, let's see. You have -- who consider
14  themselves to be Hispanic? You have Mike Luiz, Tad
15  Pando, Victor Rodriguez at the captain level. You have
16  Martin Montalvo, John Trevino, Danny Perales at the
17  executive level, assistant chief or executive assistant
18  chief.
19    Q. So approximately six, does that sound right?
20    A. From memory, yes.
21    Q. Okay. Are there statistics that are used by
22  the police department in order to determine the racial
23  makeup of the City of Houston?
24    A. You mean used by the police department? I
25  don't think the police department endeavors to determine

11

1  the racial makeup of the City of Houston.
2    Q. How does the police department arrive at any
3  conclusions as far as what the demographics are in the
4  city?
5    A. Well, we do it the same way anybody else does
6  it. The City of Houston planning department, the US
7  Census Bureau and other available sources of information
8  provide what the demographics of the City of Houston is.
9    Q. Okay. If I told you that the U.S. Census for
10  2006 reported the Hispanic population in Houston at
11  42 percent, does that sound fair?
12    A. I wouldn't make any conclusion at all, because
13  I'm not familiar with the data.
14    Q. Okay. But it's close to your range of 36 to
15  40 percent?
16    A. Yeah.
17    Q. Okay. Are you familiar with General Order
18  100-06?
19    A. I'm familiar with general orders. You have to
20  tell me what 100-06 refers to. There are over 800.
21        (Dirden Exhibit No. 1 was marked.)
22    A. Mission, values and guiding principles, yes.
23    Q. (By Mr. Zamora) Have you seen this document
24  before?
25    A. Yes.

12

1    Q. Let me ask you, what is a general order?
2    A. A general order is a department-issued
3  directive that specifies the general policies and
4  procedures and guidelines that we expect our employees
5  to follow.
6    Q. How does a general order come into being?
7    A. General order comes into being a number of
8  ways. Essentially, the -- there is a particular policy
9  for a particular practice or particular information that
10  a police officer or others within the organization needs
11  in order to do their job or to understand guidelines of
12  the department, a general order can be -- the chief of
13  police can issue a directive that general orders be
14  drafted.
15        Or a particular division that has expertise in
16  a particular area -- for example, juveniles, if there
17  was something that police officers need to know about
18  juveniles, then folks in the juvenile division can
19  request the chief of police to issue a general order on
20  a particular subject.
21    Q. Okay.
22    A. There are a number of ways that they come into
23  being, but they are directives that are signed by the
24  police chief and issued to all employees.
25    Q. What force and effect does a general order

3

MICHAEL DIRDEN - 3/30/2010

13

1  have?
2      A.  **General orders -- what do you mean by force**
3  **and effect?**
4      Q.  Are they applicable to everybody within the
5  department?
6      A.  **That depends on -- each general order will**
7  **tell you at the top of it whether it is applicable to**
8  **everybody or whether it's applicable to classified**
9  **employees only.**
10     Q.  Who is General Order 100-06 applicable to?
11     A.  **It says right here this general order applies**
12 **to all employees.**
13     Q.  Okay.  Can you turn over to page two on the
14 document and there's a highlighted box.  And I'd like
15 you to take a look at the box and let me know if you
16 agree with that statement.
17     A.  **I'm familiar -- totally familiar with it.**
18     Q.  Okay.  Item J states, "The department and each
19 of its commands, offices and divisions will strive to
20 reflect the ethnic and cultural makeup of the community
21 it serves."  Did I read that right?
22     A.  **Absolutely.**
23          MS. DENNIS:  Objection.  The document
24 speaks for itself.  You may proceed.
25     A.  **Yes, you read it right.**

14

1      Q.  (By Mr. Zamora) Okay.  Does the City of
2  Houston attempt to reach that goal?
3      A.  **I don't know whether the City of Houston**
4  **attempts to do it, but I know the Houston Police**
5  **Department strives to do it, yes.**
6      Q.  Okay.  Thank you.  Are there any efforts the
7  City of Houston Police Department has taken to reach the
8  goal of a representation of Hispanics reflective of the
9  community?
10     A.  **I think we've already done that and we do a**
11 **number of things to do that.  We actively recruit**
12 **Hispanics to the Houston Police Department, we actively**
13 **select, train and position Hispanics to positions within**
14 **the police department.  So I think we're -- have already**
15 **demonstrated that we strive to have a police department**
16 **that's reflective of the diversity of the City of**
17 **Houston.**
18     Q.  Okay.  How many lieutenants are on the Houston
19 Police Department?
20     A.  **Approximately 200 probably.**
21     Q.  And how many of those 200 lieutenants are
22 Hispanic?
23     A.  **Probably 18 to 22.**
24     Q.  So what percentage --
25     A.  **I don't know the percentage.  I'm not a**

15

1  mathematician.
2      Q.  Okay.  What about captains on the Houston
3  Police Department?  What percentage are Hispanic?
4      A.  **I think I've already answered that I don't**
5  **know what the percentage is.  Earlier I gave you the**
6  **names of the three people I know who claim to be**
7  **Hispanic.**
8      Q.  How many captains are there on the Houston
9  Police Department?
10     A.  **There are approximately 40.**
11     Q.  And I believe you gave me three names.
12     A.  **Uh-huh.**
13          MS. DENNIS:  Objection, asked and
14 answered.
15     Q.  (By Mr. Zamora) Do you believe that's
16 reflective of the City of Houston Hispanic population?
17     A.  **What do you mean reflective?**
18     Q.  Percentage.
19     A.  **No, I don't think we try to nor does the**
20 **general orders say that we try to match the percentage**
21 **of ethnicity in the population.  We say that we try to**
22 **reflect.**
23     Q.  Do you believe the current Hispanic population
24 on the Houston Police Department reflects the ethnic and
25 cultural makeup of the community?

16

1      A.  **Absolutely, yes.**
2      Q.  As far as commanders?
3      A.  **Yes.**
4      Q.  Okay.  Why do you believe that?
5      A.  **Because it does, in my opinion.  It is neither**
6  **the policy of the Houston Police Department nor any**
7  **police department that I'm aware of that when we are**
8  **recruiting, selecting, training and design promotional**
9  **policies within the organization that our goal is to**
10 **ensure that we match the population exactly.  We're not**
11 **trying to match.**
12          **We have 38 percent, 40 percent of Hispanics in**
13 **the population or 40 percent of blacks in the**
14 **population.  We're not trying to make sure that we have**
15 **40 percent of our captains will be black or 40 percent**
16 **of our sergeants will be black or 40 percent of officers**
17 **are black.**
18     Q.  What's the purpose of General Order 100-06,
19 then?
20     A.  **The purpose of General Order 100-06 is**
21 **reflected in the document itself and it outlines a**
22 **number of purposes.  It outlines what the policy is,**
23 **what's the department's mission, what's our values, what**
24 **are guiding principles.  Outlines a number of things.**
25     Q.  As far as Item J on page two is what I'm

4

17

1  referring to.
2      A.  As far as Item J on page two, as I read that,
3  the purpose of this section is to reflect the general
4  principles of the Houston Police Department that we are
5  an equal opportunity employer, that we will make sure
6  that we will have no barriers that prevent people from
7  competing equally, and that to the extent we can without
8  violating provisions of being an equal opportunity
9  employer, we will have practices that promote diversity
10  within our ranks, our organization.
11      Q.  Okay.  Why don't you define equal opportunity
12  employer for me.
13      A.  Equal opportunity employer means that
14  everybody will have an opportunity to compete for
15  selection and promotion to positions in a general sense
16  that those standards are developed by law, by best
17  practices and by industry standards.
18      Q.  How does one have an equal opportunity to
19  compete for a lieutenant's position that's not posted?
20          MS. DENNIS:  Objection, assumes facts not
21  in evidence.
22      A.  If A person has an equal opportunity to
23  compete for a lieutenant position that's not posted?
24  Typically lieutenant positions in most cases may not be
25  posted.  Lieutenant is an upper management position.

18

1  Our general order on transfers clearly specifies that,
2  and number of cases, you go out and you recruit folks
3  for selection to positions.
4      Q.  (By Mr. Zamora)  You just defined equal
5  employment opportunity employer --
6      A.  Uh-huh.
7      Q.  -- as giving everyone an equal opportunity to
8  compete; is that correct?
9      A.  I think I defined it as giving everybody an
10  opportunity -- an equal opportunity to compete as those
11  standards are determined by law, by policy, by industry
12  standards.  Yes, that's what I said.
13      Q.  And if a lieutenant's position is not posted,
14  it's your position that the employee is still qualified
15  to compete for that position?
16          MS. DENNIS:  Objection, asked and
17  answered.
18      A.  And I believe I answered that for upper
19  management -- lieutenant is considered an upper
20  management position.  And one of the responsibilities of
21  a division commander is to go out and recruit people for
22  positions.  Some positions are posted, some are not.
23      Q.  (By Mr. Zamora)  Are you as an executive
24  assistant chief supposed to be familiar the orders --
25  general order of the Houston Police Department?

19

1      A.  Uh-huh.  I am.
2      Q.  Okay.  Are you familiar with General Order
3  300-02?
4      A.  300-02 is our transfer policy, yes.
5      Q.  Okay.  And are you aware that it's been
6  changed in 2009?
7      A.  General Order 300-02 has been changed a number
8  of times, so I can't tell you exactly when it was
9  changed.
10      Q.  When was the most recent?
11      A.  I can't tell you.
12          MS. DENNIS:  If you want to show him a
13  copy of the document.
14      Q.  (By Mr. Zamora)  Did you testify a moment ago
15  that lieutenants are upper management in the Houston
16  Police Department?
17      A.  Yes, I did.
18      Q.  Okay.  So you're not aware, then, that the
19  general order has changed labeling lieutenants middle
20  manager now?
21      A.  No, don't know whether it's middle manager.
22  It's still considered upper management.  I don't think
23  the exact language makes a difference.
24      Q.  Would the chief of police issue a general
25  order changing language with no purpose?

20

1          MS. DENNIS:  I'm going to object right
2  now.  Mr. Zamora, if you want to show the chief a copy
3  of the general order you're referring to to assist him.
4  This isn't going to be like a pop quiz.  If you have a
5  document that you're referring to that you want him to
6  testify to, I think you should make it available.
7          MR. ZAMORA:  He just testified as an
8  executive assistant chief he is familiar with the
9  general orders of the Houston Police Department.
10          MS. DENNIS:  He does not have them
11  memorized.
12          MR. ZAMORA:  Are you testifying for him?
13          MS. DENNIS:  I am not testifying for him.
14  He's already stated that there are over 800 general
15  orders.  He stated that on the record.  If you have it,
16  and you obviously do, what's wrong with allowing the
17  witness to look over it?
18          MR. ZAMORA:  I'm just asking a general
19  question as far as middle management and upper
20  management.  He used the term upper management.
21      Q.  (By Mr. Zamora)  Is there a general order
22  that states that as an executive assistant chief or
23  upper management you're expected to know the general
24  orders?
25          MS. DENNIS:  I'm going to object again.

MICHAEL DIRDEN - 3/30/2010

21

1  The documents speak for themselves. The general orders
2  speak for themselves.
3      A. As I previously testified, all of us are
4  expected to know the general orders. We do not
5  expect -- we are not expected to have them memorized.
6  We know the general content of them. The reason why you
7  contain them in a manual or online is because when you
8  need to for particular purposes, you can go look at
9  them.
10     Q. (By Mr. Zamora) Okay.
11     A. We don't have pop quizzes on general orders.
12     Q. This isn't a pop quiz. That is a deposition.
13     A. I didn't say it was.
14     Q. How long have you known about this deposition?
15     A. I didn't say that it was.
16     Q. How long have you known about this deposition?
17     A. How long have I known about this deposition?
18     Q. Yes.
19     A. About a week.
20     Q. Do you communicate with your attorney?
21     A. Are you referring for this particular cause of
22  action?
23     Q. Yes.
24     A. As need be, yes.
25     Q. Who is Daryl Henderson? Do you know Daryl

22

1  Henderson?
2      A. I know who Daryl Henderson is. He's a
3  sergeant in the Houston Police Department.
4      Q. Do you know anything about a conversation that
5  Sergeant Henderson had with Assistant Chief, now Acting
6  Chief McClelland regarding Lieutenant Manuel Zamora
7  being a dumb Mexican?
8      A. No, I do not.
9      Q. Do you know anything about a conversation
10  Sergeant Henderson had with Lieutenant Zamora saying
11  that he would never amount to anything at the Houston
12  Police Department?
13     A. I don't know anything about conversations that
14  Sergeant Henderson had with anybody.
15     Q. Okay. Has he ever been under your command?
16     A. No, he has not.
17     Q. Okay. Is there any type of training that the
18  department provides to enable captains to conduct a fair
19  and objective selection process for their lieutenants?
20     A. Captains, as well as all Houston police
21  officers, are required to attend in-service training on
22  an annual basis. Part of that training for captains
23  includes managerial training. Captains are also, like
24  other employees of the Houston Police Department, are
25  trained in interpersonal skills.

23

1      And if the question is what specific training
2  that captains receive that addresses issues of
3  discrimination and harassment, all captains as well as
4  Houston police officers are required to receive such
5  training and have done so.
6      Q. I'm going to object to the answer. I'm going
7  to ask the question again --
8          MS. DENNIS: What was your objection?
9      Q. (By Mr. Zamora) -- because I believe it was
10  nonresponsive to my question.
11     My question is specifically: Is there any
12  special training the department provides to enable
13  captains to conduct a fair and objective selection
14  process for lieutenants?
15     A. And my answer is as I stated. That's my
16  answer. I believe all of that training enables captains
17  to initiate a fair and objective process for not only
18  lieutenants, but for anybody that they're selecting.
19     Q. Why don't you tell me what the transfer policy
20  is that involves lieutenants?
21     A. Lieutenants?
22     Q. Yes.
23     A. The transfer policy --
24          MS. DENNIS: I'm going to, number one,
25  object, the document speaks for itself. Number two, I'm

24

1  going to ask you, Mr. Zamora, because you do have copies
2  of the general order, if you could provide that to the
3  witness so that he can testify regarding the policy. I
4  don't think that it's fair that you should ask him to
5  have to memorize it.
6      A. I can answer.
7          MS. DENNIS: I'm sure you can, but there
8  might be additional questions and they have a copy of
9  the general orders.
10     Q. (By Mr. Zamora) Tell me your understanding
11  of what the policy includes.
12     A. Captains using for selection of lieutenants?
13     Q. Yes.
14     A. Lieutenants are selected by captains based on
15  the approval of the assistant chief, executive assistant
16  chief, and in some cases the chief of police, because
17  they're considered upper management, or if the general
18  orders have been changed to call them mid management,
19  doesn't make a difference in terms of how they're
20  selected, but they are -- go all the way to the chief of
21  police in some cases.
22     Q. Okay. What is the personnel allocation
23  committee?
24     A. Personnel allocation committee is a committee
25  that is comprised of the four executive assistant

25

1   chiefs. They meet on a biweekly basis and they
2   presently meet to administer the transfer process of the
3   City of Houston Police Department, to make sure that we
4   stay within bounds.
5       Q. When you say within bounds, what do you mean?
6       A. The allocation formula or the personnel
7   formula of the Houston Police Department requires within
8   a range of percentages that we have a certain number of
9   folks in patrol, a certain number of folks in
10  administration, a certain number of folks in
11  investigations and a certain number of folks in
12  personnel support operations.
13      Q. Okay. When you say a certain number of folks
14  in different --
15      A. Certain percentage of the manpower of the
16  department.
17      Q. Okay. Is there any consideration for race or
18  ethnicity on those?
19      A. No. We're an equal opportunity employer. We
20  don't select persons on the basis of their race.
21      Q. Do you consider it?
22      A. No, do not.
23      Q. What do you consider to be the fairness and
24  objectivity of the selection process for lieutenants?
25  What process do you consider to be fairly and

26

1   objectively administered?
2           MS. DENNIS: Objection, vague.
3       A. I'm not sure what you mean by that.
4       Q. (By Mr. Zamora) Okay. Well, the general
5   orders of the police department are that individuals
6   are to be treated fairly and objective consideration is
7   to be made for positions. Is that generally fair to
8   say?
9           MS. DENNIS: Objection, assumes facts not
10  in evidence.
11      A. I think the general orders specify procedures
12  and the process for selecting and transferring employees
13  within the organization. But then, our overall
14  guideline is being an equal opportunity employer and
15  within the mandate of General Order 100-06 where it says
16  that we strive to ensure that divisions reflect the
17  ethnic makeup of the City. The process for selecting
18  employees still, however, is governed under established
19  criteria that does not give a preference for race or
20  gender or ethnicity.
21      Q. (By Mr. Zamora) What are the objective
22  criteria used for the selection of a lieutenant?
23      A. Depends on the division.
24      Q. Like what?
25      A. Depends on the division. If you're selecting

27

1   a lieutenant for robbery, the objective criteria may be
2   different than criteria for selecting a lieutenant for
3   human resources.
4       Q. Is there any standard objective requirements
5   for a lieutenant's position that apply across the board?
6       A. Any standard for objective --
7       Q. Miniumum qualifications.
8       A. You have to be a lieutenant and that's one you
9   take a test -- promotional test to obtain that position.
10      Q. Is that all or are there any others?
11      A. You mean that will apply for --
12      Q. That generally would apply to lieutenant
13  transfer?
14          MS. DENNIS: Objection, vague.
15      A. I think the standard criteria has already been
16  set for lieutenant transfers that lieutenants are
17  transferred or moved or selected by the captain as
18  approved by the assistant chief, executive assistant
19  chief, and sometimes the chief of police. But in terms
20  of particular standards, they will be unique for each
21  position.
22      Q. (By Mr. Zamora) Do subjective standards play
23  into the selection process?
24          MS. DENNIS: Objection, vague.
25      A. I don't know what you mean by subjective

28

1   standard.
2       Q. (By Mr. Zamora) Do you know what subjective
3   means?
4       A. I have an idea what subjective means, but I
5   don't know what subjective means in your context.
6       Q. What does subjective mean?
7       A. Subjective means that in some cases that don't
8   have a defined reason for, defined criteria for making
9   the decision, that your criteria for making that
10  decision is criteria that you establish and it is
11  independent of measurement by an outside party.
12      Q. Okay. Are friendships considered to be a
13  subjective consideration?
14      A. Could be. Depends on whether you value your
15  friends based on who you are or whether you value your
16  friends based on what they can do or have done for you.
17      Q. Are subjective considerations a factor in
18  lieutenant -- the filling of lieutenant positions?
19      A. I think I've already answered that it depends
20  on who's doing it. It could be.
21      Q. Okay. Is there any method or any process that
22  the City of Houston Police Department can use to
23  eliminate subjective considerations for transfers to
24  lieutenant positions?
25      A. I don't know if there is a process or if it is

7

MICHAEL DIRDEN - 3/30/2010

29

1    desirable to eliminate all subjective criteria from
2    assessing transfer for anybody at any rank.
3        Q.   What is more important in terms of selection
4    of a lieutenant; is objective considerations more
5    important or subjective considerations?
6        A.   I think they may be equally important.
7        Q.   Why so?
8        A.   Because a lieutenant is typically a person who
9    occupies the position right next to the captain.  And in
10   most cases, a captain is the person who's in charge of
11   an operation.  And for a position of that importance and
12   for somebody who may have to assume a mantel of
13   leadership when you're not available, a good subjective
14   criteria is whether that person shares the same
15   management philosophy that I do.
16       Q.   Is the utilization of subjective criteria a
17   part of the selection process, then?
18       A.   I think I've already testified that it can be,
19   yes.
20       Q.   Okay.  I want to ask you about some
21   promotions -- I'm sorry -- transfers of lieutenant
22   positions and I just want to ask you if you know these
23   individuals.  Do you know a David Fausek?
24       A.   Not really.  I've met him.
25       Q.   Okay.

30

1        A.   I don't know him.
2        Q.   Okay.  So since you don't know him, you
3    probably don't know anything about his transfer to a
4    lieutenant's position at the academy?
5        A.   I know he worked at the academy, but I don't
6    know anything about the specifics of how he got there.
7        Q.   Okay.  Do you know Ken Miller?
8        A.   Yes, I do know Ken Miller.
9        Q.   Who is Ken Miller?
10       A.   I know he's a lieutenant in the Houston Police
11   Department.
12       Q.   Do you know anything about his transfer to a
13   lieutenant's position in recruiting?
14       A.   No, I do not.
15       Q.   Do you know anything about his qualifications
16   as a lieutenant?
17       A.   I haven't supervised Ken, no.  But some people
18   who he's worked for, he did a presentation for executive
19   staff last week.  Currently works in patrol.  Chief
20   Munden is over patrol.  Chief Munden says he generally
21   does a good job there.  When he was in recruiting, I
22   believe Chief Munden was over recruiting at the time and
23   Chief Munden considered him to be a very good job in
24   recruiting at the time.
25       Q.   Okay.  Let me ask you about Stephen Casko and

31

1    his appointment to lieutenant's position at the crime
2    reduction unit.  Do you know anything about that?
3        A.   I know he was assigned to the crime reduction
4    unit, yes.  And I actually have worked with Steve Casko
5    and have supervised his performance as a lieutenant in
6    the crime reduction unit.
7        Q.   Do you know anything about his qualifications
8    as a lieutenant?
9        A.   I can't tell you about his qualifications as a
10   lieutenant, but I can tell you about his qualifications
11   as a lieutenant over the crime reduction unit, because I
12   have supervised that unit and I have supervised his
13   performance, and he is very good.  Quite capable of
14   doing it.
15       Q.   My question is, and I want to try to limit you
16   to the question that I'm asking, and that is:  Do you
17   know anything about his qualifications as a lieutenant
18   and his transfer to the crime reduction unit?
19       A.   I think --
20            MS. DENNIS:  Objection, vague.  And you
21   know what, that's probably a knock for me.  Can we go
22   off the record?
23            MR. ZAMORA:  Okay.
24            (Short break from 1:54 to 1:59 p.m.)
25       Q.   (By Mr. Zamora)  I want to move on with the

32

1    knowledge that you might have about individuals who are
2    transferred to different units, and I want to move on
3    to Jay Gause.  Do you know Jay Gause?
4        A.   Yes, I do.
5        Q.   Do you know anything about his transfer as the
6    lieutenant to the ADR unit?
7        A.   When you say do I know anything about it, do I
8    know it existed or did I have a part in evaluating what
9    his qualifications are?
10       Q.   I just want to know if you know anything about
11   the transfer.
12       A.   No, I don't know why he was transferred.
13       Q.   Okay.  Do you know why Jennifer Evans was
14   transferred to the ADR unit?
15       A.   No, I don't know why she was transferred to
16   the ADR.  For all of them, whoever was transferred, I
17   assume that the person who selected them believed that
18   they were capable of doing the job.  But was I
19   specifically involved in the transfer, no.
20       Q.   Okay.  So you don't have any independent
21   knowledge about the circumstances surrounding the
22   transfer?
23       A.   No.
24       Q.   Do you know anything about the circumstances
25   surrounding the transfer of Daniel Spjut to the ADR

8

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

33

1  unit?
2      A.  No.
3      Q.  What about Shannon Broze to the ADR unit?
4      A.  Shannon who?
5      Q.  Shannon Broze.
6      A.  No.  Wasn't involved in the selection of any
7  of those folks.
8      Q.  Okay.  Do you know anything about how long
9  David Fausek has been in the academy lieutenant
10 position?
11     A.  No.
12     Q.  Okay.  Do you know anything about how long Ken
13 Miller was a lieutenant at recruiting?
14     A.  No.
15     Q.  Do you know anything about Shannon Broze, her
16 leaving the ADR unit?
17     A.  No.
18     Q.  Do you know anything about any lieutenant
19 positions that Lieutenant Zamora has applied for or
20 requested?
21     A.  No.
22     Q.  Do you have an opinion -- professional opinion
23 about Lieutenant Manuel Zamora?
24     A.  Yeah, I do.
25     Q.  What is your opinion?

34

1      A.  Manny is a friend.  Met Manny in 1991.  We
2  both served on the executive board together.  I was
3  there already as an officer.  Dave Watson was a
4  sergeant.  Manny was brought in with Lieutenant Robert
5  Owens, Lieutenant Craig Goralski and Manny.  They were
6  all recently promoted to lieutenant, so I've known Manny
7  since 1991.
8      Q.  Thank you.  Have you heard anything about
9  Lieutenant Zamora from your colleagues as far as his
10 reputation?
11     A.  No.  Not about his reputation, no.
12     Q.  Anything else about him?
13     A.  About Manny in general?
14     Q.  Yeah, just in general.
15     A.  Only experience that I've known about Manny
16 is -- came during a period of time a number of years ago
17 when I was assigned to the office of general counsel.
18 Other than that, no.
19     Q.  So you don't know anything about his
20 reputation, then?
21          MS. DENNIS:  Objection, asked and
22 answered.
23     A.  Can't say any comments about what his
24 reputation is in the community.  Manny is introverted.
25 His reputation as being competent, yes.

35

1      Q.  (By Mr. Zamora) Okay.  Are you familiar with
2  the EEOC complaint Lieutenant Zamora has made in
3  December 2007?
4      A.  Yes.
5      Q.  What is your understanding of the complaint?
6      A.  The complaint I've read is that he has
7  essentially three grievances against the department; one
8  is not being promoted to assistant chief of police, the
9  second one was not being transferred to positions that
10 he desired, third was not being promoted to captain.
11     Q.  Have you been at all involved in any
12 investigation as far as the merits of these complaints?
13     A.  Involved in the investigation of the merits of
14 the complaint?  No, I was not investigator.  I have read
15 the reports.
16     Q.  When you say the reports, what are you
17 referring to?
18     A.  Well, when the department -- when somebody
19 makes an EEOC allegation, the department has to respond
20 to the charges and I've read the department's response.
21     Q.  Okay.  But you weren't involved in the
22 department's response?
23     A.  No.
24     Q.  Okay.  Do you know anything about the
25 lieutenant transfers that Lieutenant Zamora has

36

1  requested in the past?
2      A.  No.
3      Q.  Do you know who responded to the December 2007
4  EEOC charges?
5      A.  Who specifically responded?  It would have
6  been somebody from the legal department.  The responses
7  are -- typically when you get a notice from the EEOC, it
8  comes to the department and you ship it out to a number
9  of folks in order to get the information.  But then,
10 someone ultimately in the legal services unit writes the
11 response based on information that is provided from
12 other sources in the department.
13     Q.  So there's an inquiry made to the division
14 that's involved?
15     A.  Yes.
16     Q.  Okay.  Do you know whether relating to
17 Lieutenant Zamora's EEOC complaint that the CRU unit was
18 contacted?
19     A.  I don't know specifically, but if he made --
20 if part of his allegation is that he applied for a
21 transfer to the CRU unit.
22     Q.  But you're just speculating?
23     A.  You asked me did I know.
24     Q.  Do you know?
25     A.  No.

9

MICHAEL DIRDEN - 3/30/2010

37

1  Q.  So you do know?
2  A.  No.  I said no.
3  Q.  All right.  Do you know if the training
4  division was called?
5  A.  Yes, I know that a response from a person who
6  was a captain over the training division was requested.
7  Q.  Who was that?
8  A.  Craig Goralski.
9  Q.  What do you know about that?
10  A.  I know that he was requested.  He had to write
11  a response.
12  Q.  Okay.  Did you communicate with him at all?
13  A.  About his response?
14  Q.  Yeah.
15  A.  No.
16  Q.  Did you communicate at all with him about this
17  case?
18  A.  I know that he had to make a response.  We did
19  communicate about that, yes.
20  Q.  What did you communicate about?
21  A.  That he had to make a response.
22  Q.  And that's all?  You didn't discuss the merits
23  of it?
24  A.  No.
25  Q.  What about the ADR?  Do you know if they were

38

1  contacted?
2  A.  Don't know.
3  Q.  Do you know why training would be contacted,
4  but not the gang division?
5  A.  I didn't state whether the gang division was
6  contacted or not.  I said I didn't know.
7  Q.  Okay.  Have you ever worked with Lieutenant
8  Zamora?
9  A.  Yes, I did.  I stated we worked together in
10  1991 on the executive board.
11  Q.  How would you characterize his work product?
12  A.  Manny is very competent.  Matter of fact, I
13  recently got something from Manny within the last couple
14  of weeks.  I know I did.  I don't remember what it was,
15  but I know I did.
16  Q.  Was it completed in a satisfactory manner?
17  A.  Yes.
18  Q.  And I think your testimony was -- and correct
19  me if I'm wrong -- you don't know anything about the
20  positions that he's applied for transfers to?
21  A.  No, I do not.
22  Q.  Do you know anything about Lieutenant Zamora's
23  credentials?
24  A.  Yes, I do.
25  Q.  What do you know?

39

1  A.  Like I said, I've known Manny since 1991, so I
2  know Manny has a Ph.D.
3  Q.  Do you know he's been featured in a book
4  called Faces of Evil for his investigative abilities?
5  A.  No, I do not.
6  Q.  Are you aware of whether he's testified in
7  several district courts as an expert on sexual
8  homicides?
9  A.  No, I do not.
10  Q.  Do you know whether he's qualified to be a
11  lieutenant in homicide?
12  A.  Whether he is qualified to be a lieutenant in
13  homicide?
14  Q.  Yes.
15  A.  Based on what I know about selecting
16  lieutenants, yeah, Manny would be qualified to be a
17  lieutenant in homicide.
18  Q.  Okay.  Who is Leslie Martinez?
19  A.  Leslie Martinez is a current lieutenant in
20  homicide.
21  Q.  Would it surprise you, according to Lieutenant
22  Zamora, that Captain Dale Brown disqualified him and
23  lied to him that there were no vacancies in homicide
24  when he contacted Leslie Martinez to offer her the
25  position?

40

1  MS. DENNIS:  Objection.
2  A.  Well, I know that would be not be a true
3  statement, because -- well, let me correct.  I don't
4  know -- don't have any independent knowledge of Dale
5  Brown offering a lieutenant position to Leslie Martinez
6  as a homicide lieutenant.  I know Leslie Martinez is a
7  homicide lieutenant, because the current captain just
8  brought her there a few months ago.
9  Q.  (By Mr. Zamora)  So she was transferred out
10  of homicide, then, do you know?
11  A.  No.  Leslie Martinez just transferred into
12  homicide within the last four months.  So if she
13  previously served a stint in homicide, I was not aware
14  of it.
15  Q.  So she left and came back probably?
16  A.  If she served previously there before, yes.
17  Q.  Do you know anything about how Lieutenant
18  Zamora ended up in the planning and research section of
19  crime analysis and command center division?
20  A.  No.
21  Q.  Do you know who might know about that?
22  A.  No.  Whoever his captain was at the time.
23  Q.  Do you know if Chief McClelland could respond
24  to that?
25  A.  I don't know what Chief McClelland's knowledge

41

1    base is. But if he was not in that chain of command at
2    the time, I would be speculating about what he knows
3    also.
4        Q.  Okay. Was Chief McClelland the executive
5    assistant chief of the administrative operations, do you
6    know?
7        A.  Yes, he was, from some period in 2004 -- I
8    believe it was April 2004 until January -- excuse me --
9    until December 31st, 2007.
10       MR. ZAMORA: Let's go off the record for
11   five minutes.
12       MS. DENNIS: Okay.
13       (Short break from 2:17 to 2:32 p.m.)
14       Q.  (By Mr. Zamora) Chief, who is Kathryn Hanes?
15       A.  Kathryn Hanes is a retired police captain.
16       Q.  Okay. What division was she over while she
17   was employed?
18       A.  As a captain?
19       Q.  Yes.
20       A.  Her last position as I remember, she was over
21   human resources or recruiting. I can't remember if we
22   had combined them at that time.
23       Q.  Okay. Do you know anything about her asking
24   Lieutenant Zamora to leave the recruiting division?
25       A.  No, I do not.

42

1        Q.  Do you know anything about a conversation that
2    Lieutenant Zamora had with Charles McClelland while he
3    was an assistant chief at administrative operations?
4        A.  No, I do not.
5        Q.  Do you know anything about the charge of
6    retaliation that Lieutenant Zamora is claiming
7    concerning the fact that he was ordered to leave the
8    recruiting division?
9        A.  No, I do not.
10       Q.  Who would know about Lieutenant Zamora's
11   transfer requests to lieutenant positions that he
12   sought?
13       A.  The people who he applied or divisions where
14   he applied for transfer to.
15       Q.  If the position wasn't posted that he was
16   seeking, I'm just trying to figure out who would have
17   this information.
18       A.  Then how would he apply? If he applied, then
19   somebody would know, because he would make an
20   application to them.
21       Q.  What is a three by five?
22       A.  Three by five is a generic term that is used
23   to describe an employee's internal affairs complaint
24   history. It reflects the complaints against the
25   employee, whether they're internal, external, and the

43

1    disposition of those complaints.
2        Q.  What is the disposition that is typically
3    contained on a three by five? Is it sustained, not
4    sustained?
5        A.  It contains all of those. It lists each
6    complaint against an employee and what the disposition
7    is.
8        Q.  Okay.
9        A.  In terms of disposition, there are several
10   ways to categorize the disposition of a complaint. One
11   is sustained, one is not sustained, one is unfounded,
12   another is never formalized.
13       Q.  So the disposition can be updated depending on
14   what the resolution was of the complaint?
15       A.  It's not updated. It's -- it's not placed on
16   the three by five until the case is completed.
17       Q.  Okay. So in the situation where a grievance
18   has been filed, the process has gone through --
19       A.  Three by five doesn't have anything to do with
20   grievance. Three by five is discipline only. It
21   reflects the persons -- the number -- it reflects the
22   nature of citizen, internal or external complaints
23   against an officer and the disposition of the complaint.
24   Has nothing do with grievance.
25       Q.  So the resolution of that particular complaint

44

1    may not be updated if a grievance resulted in a --
2        A.  Again, a three by five has absolutely nothing
3    to do with a grievance. It has only to do with
4    complaints. Complaints against an officer, be it an
5    eternal complaint or an internal complaint. A grievance
6    is something entirely different.
7        Q.  And your testimony is that the three by five
8    cannot be changed?
9        A.  No, that's not what you asked me.
10       Q.  Okay. Can it be changed?
11       A.  Can a three by five be modified?
12       Q.  Yes.
13       A.  Yes. If there's information to show that the
14   original finding of investigation was incorrect, a three
15   by five can be changed.
16       Q.  Who changes it?
17       A.  I don't know who physically does it, but the
18   complaint history is maintained by the internal affairs
19   division. And if it is determined that an investigation
20   needs to be changed, then somebody in internal affairs
21   division would do that.
22       Q.  Can you give me an example of when it might be
23   changed?
24       A.  I think I just gave you an example. When an
25   investigation -- when further investigation determines

MICHAEL DIRDEN - 3/30/2010

45

1  that the original finding of an investigation should be
2  changed, then the three by five is changed.
3      Q. Okay. Would the three by five entry be
4  changed if there was an arbitrator's ruling that the
5  complaint should not be sustained?
6      A.  No, because an arbitrator can't make that
7  ruling. What an arbitrator determines is whether or not
8  the discipline that the department issued was sufficient
9  considering just cause, whether it was seven-day
10  suspension or a ten-day suspension, or whether the
11  arbitrator believes it should be a written reprimand or
12  whatever.
13      But the arbitrator does not have the authority
14  to change the investigative facts. Only the chief of
15  police makes that determination. So if the case is
16  sustained, the arbitrator can say that I believe that it
17  should be not sustained, but it has no legal effect
18  because that's outside the jurisdiction.
19      Q. What about a district court decision? Would
20  that make any bearing on the internal affairs three by
21  five?
22      A.  Depends on what the district court decision
23  is.
24      Q. If there's an agreement between the parties,
25  that doesn't make a difference as far as the resolution

46

1  or the disposition of that three by five?
2      A.  Agreement --
3          MS. DENNIS: Objection, vague.
4      A.  -- between what parties?
5      Q. (By Mr. Zamora) I'm sorry?
6      A.  Agreement between what parties?
7      Q. Between the City of Houston and a grievant.
8      A.  If the City of Houston agrees to change, the
9  City of Houston or the police department can certainly
10  agree to change a three by five, because the chief of
11  police would have to make that agreement.
12      Q. Okay. So if the chief of police made that
13  agreement, then the three by five should be changed,
14  right?
15      A.  If he made the agreement and then he directed
16  them to change the three by five, yes.
17      Q. Okay. Tell me how the change is actually
18  carried into effect.
19          MS. DENNIS: Objection, vague.
20      A.  What do you mean?
21      Q. (By Mr. Zamora) You testified that the three
22  by five can be changed in the event that there's an
23  agreement or the chief agrees that it should be
24  changed.
25      A.  Uh-huh.

47

1      Q. How is it actually changed?
2      A.  What do you mean?
3          MS. DENNIS: Objection, asked and
4  answered.
5      A.  I think I've already -- sorry. I think my
6  testimony was that somebody in internal affairs division
7  would make the change to reflect whatever the nature of
8  the agreement was.
9      Q. (By Mr. Zamora) And the change would be
10  reflected on the three by five itself?
11      A.  If that's what the agreement is, to change the
12  three by five, yes.
13      Q. Okay.
14      A.  If that's the agreement.
15      Q. If the agreement is to change the
16  categorization to a not sustained status, would that
17  show up on the three by five?
18      A.  Yes, it would. And the agreement was to
19  change the categorization to not sustained, yes, it
20  should.
21      Q. What happens if it's not changed?
22      A.  It would be an example of somebody who didn't
23  do their job. If they were told to change it and they
24  didn't do their job, then somebody would go back and
25  change it.

48

1      Q. Okay. Have you seen Lieutenant Zamora's three
2  by five?
3      A.  I have seen it before, but I have not looked
4  at it as far as this case, no.
5      Q. Do you have any independent recollection of
6  what you saw on the three by five?
7      A.  No.
8      Q. Do you have any opinion about Lieutenant
9  Zamora's honesty?
10      A.  Do I have an opinion about his honesty? As
11  far as I know as his honesty in dealing with me, I
12  consider him to be honest.
13      Q. What about truthfulness?
14      A.  As far as -- only as it relates to his
15  dealings with me, yes.
16      Q. Okay. Let me show you a document here.
17          (Dirden Exhibit No. 2 was marked.)
18      Q. (By Mr. Zamora) Have you had the opportunity
19  to look at this document?
20      A.  Yes.
21      Q. What is it?
22      A.  It's -- I believe it purports to be what it
23  says it is, compromise and settlement agreement.
24      Q. Okay. I'm just curious and I want you
25  opinion, because you're the executive assistant chief

MICHAEL DIRDEN - 3/30/2010

49

1   and the representative today. And on page two of this
2   document, under Item 2(4), the document lists part of an
3   agreement, obviously, that the City of Houston agrees
4   and warrants to expunge the previously-filed letter of
5   indefinite suspension from all Lieutenant Zamora's
6   personnel files maintained by the City of Houston agrees
7   replace the expunged letter with the letter attached as
8   Exhibit D.
9       And Item 5 -- and the question is going to
10  relate to Item 5. It says, "All allegations sustained
11  in the internal affairs investigation in this matter
12  except conduct and behavior shall be categorized as not
13  sustained in Lieutenant Zamora's internal affairs file."
14  Is there a reason why internal affairs would not have
15  changed the allegation to not sustained?
16      A.  I have no knowledge that they have not done
17  that.
18          MS. DENNIS: Mr. Zamora, can you give the
19  chief a copy of Lieutenant Zamora's internal complaint
20  history? Because if you're going to ask questions about
21  that, then I think the chief should have the opportunity
22  to review it.
23          MR. ZAMORA: I'll withdraw the question.
24      Q.  (By Mr. Zamora) But I do want to ask, would
25  it surprise you that the not sustained characterization

50

1   would still be within the civil service file?
2          MS. DENNIS: Objection. I think the
3   document would speak for itself. If you have the
4   document here that you're referring to, I think the
5   chief should be able to review it before having to give
6   any testimony regarding that.
7          MR. ZAMORA: He testified concerning
8   when -- what circumstances would support internal
9   affairs changing the classification from sustained, if
10  that's what it is, to non-sustained.
11          MS. DENNIS: He did. And now you're
12  getting very specific. You're obviously -- you narrowed
13  it down to Lieutenant Zamora's situation. The City has
14  provided you all of this documentation regarding this
15  matter. Even though these aren't the documents that we
16  produced, you have documents considering -- I mean,
17  regarding these issues in your possession.
18          So if you're going to ask my client
19  questions regarding that, I think that he should be
20  afforded the opportunity to review the document and not
21  have to guess as to what has happened or try to
22  speculate as to what's going on in the personnel file.
23          Now, if you did not have the document, I
24  wouldn't even say this, but I know that the City has
25  produced it and I think it's only fair to give him a

51

1   copy of it. I don't understand why we've had to go
2   through this several times throughout this deposition.
3          MR. ZAMORA: This is the City document.
4   The City should know what it has. Does the City know
5   what it has?
6          MS. DENNIS: The City knows what it has.
7   However, the City does not know what your line of
8   question is going to be.
9          MR. ZAMORA: I'm asking specifically
10  about the entries concerning this entry.
11          MS. DENNIS: Okay. And we just want to
12  see -- I think that you should allow the deponent the
13  opportunity to see the specific document that you're
14  referring to. There have been almost 4,000 documents
15  produced in this particular case. And to ask the chief
16  to tell you what's in one of 4,000 documents I think is
17  very unreasonable.
18          If you have a copy of it, allow him the
19  opportunity to review it. That's all I'm saying. When
20  I deposed your client, every time I asked him a question
21  about something specific, I gave him a copy of it. I
22  did not ask them to participate in pop quizzes. I don't
23  think that that's fair, nor do I think that it is
24  reasonable.
25          MR. ZAMORA: This is not a pop quiz. I'm

52

1   asking a simple question about a general principle that
2   if -- if the document is what it is and it says
3   specifically that an internal affairs investigation is
4   to be re-categorized as not sustained, should that have
5   happened.
6          MS. DENNIS: Mr. Zamora, if it's so
7   simple for you to ask a simple question, why can't you
8   simply provide the document?
9          MR. ZAMORA: The document doesn't need to
10  be provided to provide an answer to that question.
11          MS. DENNIS: I think that it does. I
12  think that he should be given the opportunity to review
13  it if you're asking him about it.
14          MR. ZAMORA: I'm asking a simple question
15  concerning the question of whether or not an order has
16  been followed by the City of Houston.
17          MS. DENNIS: And it may be simple.
18  However, it's also very specific, and you have the
19  document. And I don't understand why you will not allow
20  my client to see documents today.
21          MR. ZAMORA: The City has the document as
22  well. I will --
23          MS. DENNIS: The City is not deposing
24  right now, because believe me, if I was giving a
25  deposition right now, I would have documents so that the

53

1  witness could have the opportunity to review it.
2          MR. ZAMORA: We will move on.
3          MS. DENNIS: I don't mind going off the
4  record to get a copy of the document if you're just
5  stating that you don't have a copy of it. But to ask my
6  client these questions blindsided I just don't think is
7  reasonable, but I can definitely go get a copy that we
8  produced.
9          MR. ZAMORA: Let's go off the record.
10         (Short break from 2:53 to 3:06 p.m.)
11         MR. ZAMORA: I'm going to withdraw that
12  last question.
13     Q.  (By Mr. Zamora) And you still have the
14  document before you?
15     A.  Yes.
16     Q.  If an arbitrator rules that a document should
17  be expunged from a file, is that something the City of
18  Houston would follow?
19     A.  **Arbitrator doesn't have jurisdiction to rule**
20  **that a document be expunged. Pursuant to Chapter 143**
21  **and our meet and confer contract, an arbitrator has the**
22  **ability to rule on discipline. He cannot change the**
23  **findings of a case, he cannot change the facts of a case**
24  **or order that documents be expunged.**
25     Q.  So that's outside their jurisdiction, then?

54

1     A.  **Yes.**
2     Q.  If the arbitrator orders a new document to be
3  submitted in place of an old document, is that also
4  outside the jurisdiction of the arbitrator?
5     A.  **He cannot order that a new document be**
6  **submitted. It's outside his jurisdiction.**
7     Q.  If the City of Houston agrees by a decision,
8  an agreed entry, would the City be bound by that?
9     A.  **If the City of Houston made an agreement to do**
10  **something?**
11     Q.  Yes.
12     A.  **Would they be bound by the agreement? Yes.**
13         MS. DENNIS: You know, and I want to
14  object for the record, Mr. Zamora, that this document is
15  dated January 9th, 1997, which is outside of the statute
16  of limitations and it's also outside of the relevant
17  time period for this lawsuit.
18         MR. ZAMORA: The objection is noted. I
19  believe that the City has introduced this document as
20  well.
21     Q.  (By Mr. Zamora) I just want to focus on Item
22  No. 4 on the second page, because it does say that a
23  letter of indefinite suspension was to be expunged from
24  Lieutenant Zamora's file. And if the City of Houston
25  has not expunged that document, then is that consistent

55

1  with this agreement?
2     A.  **I have no independent knowledge whether or not**
3  **the City of Houston has failed to fulfill that**
4  **obligation.**
5     Q.  But if it is in there, is that a violation?
6         MS. DENNIS: Objection, causes the
7  witness to speculate.
8     A.  **If the City of Houston did not remove this**
9  **dockment from his personnel files, it means that it's**
10  **something that they failed to do.**
11     Q.  (By Mr. Zamora) Okay. Thank you. What
12  procedures should a captain follow in choosing a
13  lieutenant?
14     A.  **I don't know there are any established**
15  **procedures that a captain should follow in choosing a**
16  **lieutenant.**
17     Q.  Is that because you haven't been a captain or
18  you just don't know?
19     A.  **No. Because I think I previously testified**
20  **that captains and lieutenants are -- excuse me -- that**
21  **lieutenants are selected by captains based on approval**
22  **of the assistant chief, executive assistant chief and**
23  **ultimately the chief of police. Whatever criteria they**
24  **establish for that position would be unique to each**
25  **individual position. That was my testimony.**

56

1     Q.  Do you know anything about how Lieutenant
2  Zamora received his assignment into the recruiting
3  division?
4     A.  **No.**
5     Q.  Do you know who might know that?
6     A.  **Whoever selected him.**
7     Q.  Are you aware of a general order in 1994 that
8  enabled objective criteria to be used for lieutenant
9  selections?
10    A.  **No.**
11        **(Dirden Exhibit No. 3 was marked.)**
12    Q.  (By Mr. Zamora) Have you seen this document
13  before?
14    A.  **No.**
15    Q.  Several pages back is a General Order
16  No. 300-02. Does that general order look familiar?
17    A.  **No.**
18    Q.  This is a general order that apparently was in
19  effect of May of 1993, according to the date on it.
20        MS. DENNIS: And I'm going to object to
21  this document being outside the relevant time period of
22  this lawsuit.
23    A.  **That's what it says on the document, yes.**
24    Q.  (By Mr. Zamora) And on page six on the
25  nonselection, Item No. 6, says that after an applicant

MICHAEL DIRDEN - 3/30/2010

57

1 has met a position's minimum qualifications, he must be
2 given objective consideration for the vacancy. Did I
3 read that correctly?
4 **A. That's what it says, yes.**
5 Q. Are you aware of this general order being
6 rescinded or modified?
7 **A. This thing here in 1993, that's been modified**
8 **several times.**
9 Q. Okay.
10 **A. That was 17 years ago.**
11 Q. And I believe you're right, it has been
12 modified. Looks like it was modified November 18, 1994,
13 a few pages. Back does that sound correct?
14 **A. I cannot testify as to what happened in 1994.**
15 Q. The document is behind it. According to the
16 date on the document?
17 **A. According to the date on the document,**
18 **November 18th, 1994, is one date that the document was**
19 **modified.**
20 Q. Okay. And on page three at the bottom
21 left-hand corner, it states that the rank of lieutenant
22 is upper management and is not included in the positions
23 covered by Method A or Method B voluntary transfer
24 procedures.
25         MS. DENNIS: Two objections. One, the

58

1 document speaks for itself. And two, this document is
2 outdated as it is outside of the relevant time period
3 for this lawsuit.
4 Q. (By Mr. Zamora) I read that correctly?
5 **A. You know, I don't remember.**
6 Q. On page three, the bottom left-hand corner,
7 did I read it correctly?
8 **A. I don't remember what you read.**
9 Q. "The rank of lieutenant is upper management
10 and is not included in the positions covered by the
11 Method A or Method B voluntary transfer procedures."
12 **A. Yes, that's what it says, and I believe that's**
13 **what I testified to earlier.**
14 Q. Okay. And this has been modified several
15 times?
16 **A. It's been modified several times since 16**
17 **years ago.**
18 Q. And now lieutenants are considered middle
19 management?
20 **A. I don't know whether they're considered middle**
21 **management, upper management, but it's the same.**
22 Q. Okay.
23 **A. Has no bearing on how they're selected.**
24 Q. Now or back then?
25 **A. Even now.**

59

1 Q. Back then?
2 **A. Now and back then. The distinction between**
3 **upper management or middle management has no bearing on**
4 **how lieutenants are selected.**
5 Q. Even back in 1994?
6 **A. Right here they're called upper management.**
7 Q. Okay. Is it retaliation for the chief of
8 police to change a policy to circumvent a lawful ruling?
9 **A. Excuse me?**
10 Q. Is it retaliation for the chief of police to
11 change a policy to circumvent a lawful ruling?
12 **A. I have no idea what you're referring to or**
13 **what you consider to be a lawful ruling.**
14 Q. A lawful ruling of a hearing examiner.
15 **A. And again, I feel if the chief of police**
16 **changes policy, it's because he believes the policy**
17 **needs to be changed.**
18 Q. So the chief can change a policy at his
19 discretion?
20 **A. Certainly. He's the chief executive officer**
21 **of the organization.**
22 Q. Does it matter whether the policy change is
23 reasonable or not?
24 **A. He's the chief executive officer of the**
25 **organization. Reasonableness is subjective. What's**

60

1 **reasonable to you may not be reasonable to me.**
2 Q. And he has a better discretion to make any
3 decisions as necessary?
4 **A. He has the discretion to make decisions in the**
5 **police department to the extent that those decisions**
6 **does not violate the law or policy. He's the chief.**
7 Q. Are you aware of a document that Lieutenant
8 Zamora authored called Disparate Treatment and Racial
9 Discrimination against Hispanic Officers and Civilians
10 Employed by the Houston Police Department?
11 **A. No.**
12         (Dirden Exhibit No. 4 was marked.)
13 Q. (By Mr. Zamora) Have you seen this document
14 before?
15 **A. I just said I was not aware of it.**
16 Q. Well, I asked you if you were aware of it.
17 Now I'm asking if you saw the document.
18 **A. No. Could not have seen it if I was aware of**
19 **it. I think they come together.**
20 Q. Do you know whether any action was taken
21 against Lieutenant Zamora because of this document?
22 **A. Not being aware of the document, I would not**
23 **know anything about that.**
24 Q. Okay. Let's go off the record again. I
25 apologize.

61

1        (Short break from 3:24 to 3:31 p.m.)
2    Q. (By Mr. Zamora) Chief, I'd like you to take
3  a look at this document that I handed you and I want to
4  go over some of the entries, specifically, the captions
5  that are identified, and ask you generally some
6  questions after that.
7       First, if you take a look at Item No. A on the
8  first page, the first sentence says, "Civilian personnel
9  and classified officers are often denied equal
10  opportunities in competing for employment, assignment,
11  transfer, promotion, appointment, recognition and
12  enjoyment of substantial resources provided to the
13  Houston Police Department," and it continues on.
14      And additional sections provide -- on page
15  three, there's a complaint of a lack of upward and
16  lateral mobility, Hispanics are systematically denied
17  equal opportunity.
18      MS. DENNIS: Are you -- did you ask a
19  question?
20      MR. ZAMORA: My question is going to be
21  at the end. I'm just leading some highlights on this
22  document.
23    Q. (By Mr. Zamora) On Page 11 complains of
24  egregious and disparate discipline for similar alleged
25  misconduct. On page 14, it speaks of the most recent

62

1  evidence is the captain's examination, in which
2  overemphasis on technical skill enabled four
3  lieutenants assigned internal affairs division to
4  outperform all others in written and assessment scores.
5      And it continues on, but I guess the question
6  is, as you skim this document or as you listen to the
7  portions that I read, does it appear that some employees
8  are dissatisfied with real or perceived practices of the
9  police department?
10    **A. This entire document reflects whoever -- the**
11  **opinion of the person who wrote it, and that's all it**
12  **reflects. Nothing more, nothing less.**
13    Q. (By Mr. Zamora) Okay. Well, again, as far
14  as the content of the document, are you saying that --
15    **A. The content of the document reflects the**
16  **opinion of the person who wrote it.**
17    Q. The author?
18    **A. Whoever wrote it, it's their opinion. That's**
19  **what it is. It has no independent research, there's no**
20  **independent findings, there's no studies that show any**
21  **of this occurred, there's no finding by the EEOC or any**
22  **other investigative apparatus that looked into these**
23  **allegations and made a finding that the things that are**
24  **outlined in here, the opinions of the author, are in**
25  **fact accurate, and that's all it is.**

63

1    Q. But it does set forth some perceived
2  complaints as far as --
3    **A. Yes, it does.**
4    Q. Can you tell me about the recruiting
5  lieutenant position in the past three years?
6    **A. No, I cannot.**
7    Q. Why not?
8    **A. Because I didn't work recruiting, didn't**
9  **supervise them, didn't select anybody for those**
10  **positions.**
11      **(Dirden Exhibit No. 5 was marked.)**
12    Q. (By Mr. Zamora) What is this document?
13    **A. What the document says it is is a document**
14  **written in January 9th, 2001, from C.O. Bradford to Bob**
15  **Robertson, the captain of the personnel division.**
16    Q. And it shows that among other things that
17  Lieutenant Zamora was reassigned from civilian
18  employment to recruiting, does it not?
19    **A. Yes.**
20    Q. Okay. How many cadets are in a class, do you
21  know?
22    **A. Depends for each class. They try to get 70,**
23  **but each class is unique.**
24    Q. Who is Officer Christopher Zamora, do you
25  know?

64

1    **A. Know him as Manny's son.**
2    Q. Okay. Is there anything you can tell me about
3  him?
4    **A. Don't know Chris.**
5    Q. Do you know anything about his transfer
6  history?
7    **A. Nope. Never supervised him.**
8    Q. Do you know anything about any transfers that
9  he might have sought?
10    **A. Don't know anything about Chris.**
11    Q. Okay.
12      **(Dirden Exhibit No. 6 was marked.)**
13    Q. (By Mr. Zamora) Have you seen this document
14  before?
15    **A. It's been a long time. If it's the same one,**
16  **yes.**
17    Q. And it's a Findings of Fact on Approval of
18  Consent Decree; is that correct?
19    **A. That is correct.**
20    Q. And on Item 1, it states, "African-American
21  and Hispanic-American police officers sued the City of
22  Houston because the City's promotional examinations for
23  sergeant and lieutenant discriminated against them. The
24  dispute between the plaintiffs and defendants was
25  genuine and vigorously contested." Did I read that

65

1 correct?
2    **A. Yes.**
3    Q. Item No. 9, "The promotional examinations for
4 sergeant and lieutenant had a discriminatory impact on
5 African-Americans and Hispanic-Americans. The
6 promotional examinations were not job-related." Did I
7 read that correctly?
8           MS. DENNIS: Objection. The document
9 speaks for itself and is its best evidence. You may
10 proceed.
11    **A. Yes.**
12    Q. (By Mr. Zamora) Thank you. Item No. 13 and
13 14, "The relief in the amended consent decree is
14 necessary to remedy the harm shown. Settlement is fair
15 and appropriate. The court approves the consent decree
16 as previously modified in the final judgment entered
17 March 25, 1993, and in the consent order entered
18 November 25, 1997." Did I read that correctly?
19    **A. Yes, this consent decree covered that period.**
20           MS. DENNIS: Same objection.
21    Q. (By Mr. Zamora) Do you know what this
22 complaint was?
23    **A. Yeah, I know. I was the discovery manager for**
24 **that case.**
25    Q. Okay. So what happened?

66

1           MS. DENNIS: I'm going to object right
2 now to the relevance of this case. It's already been
3 settled and handled. It occurred in 2000 and I don't
4 see how it's relevant for any line of questioning
5 regarding the relevant time period for this lawsuit.
6    Q. (By Mr. Zamora) Is the consent decree still
7 in effect?
8    **A. For -- it is still in effect. I don't**
9 **remember the exact date it will expire. I believe it is**
10 **sometime in 2011, but all the promotions that were**
11 **ordered pursuant to this consent decree were made a**
12 **number of years ago. The provisions that are still in**
13 **effect are the provisions that cover the process for**
14 **promotion for the rank of sergeant and lieutenant.**
15    Q. Generally, if sergeants and lieutenants were
16 not promoted as was alleged back in the Edwards lawsuit,
17 would that have any kind of affect on the promotions of
18 qualified Hispanics and African-Americans to captains
19 positions?
20           MS. DENNIS: Again, I'm going to object,
21 Mr. Zamora, and at this point, I'm going to ask my
22 client not to even answer any questions regarding the
23 Edwards consent decree, because that matter has been
24 handled by Judge Lynn Hughes. And if you have any -- if
25 you have any complaints regarding that matter, it has to

67

1 go there. So any questions in this deposition about the
2 consent decree that is being enforced by the United
3 States District Court is not proper in this deposition.
4    Q. (By Mr. Zamora) I'm just asking if there's
5 been any impact on the Edwards case as far as
6 promotions go. Do you know?
7           MS. DENNIS: You can answer that
8 question.
9    **A. I don't know what you mean by impact.**
10    Q. (By Mr. Zamora) Has there been any
11 consequence to the Edwards case as far as captains
12 promotions go?
13    **A. I don't know. The Edward case concerned**
14 **sergeants and lieutenants.**
15    Q. What has been the effect of the Edwards case?
16    **A. I don't know. What do you mean by effect?**
17    Q. What has been the impact of the Edwards case?
18    **A. What do you mean by impact?**
19    Q. What has been the consequence of the Edwards
20 case?
21    **A. What do you mean by consequence?**
22    Q. The result.
23    **A. The result of the Edwards case and the consent**
24 **decree was that a number of sergeants and a number of**
25 **African-Americans were promoted to sergeant and**

68

1 **lieutenant and a number of Hispanics were promoted to**
2 **sergeant and lieutenant.**
3    Q. Are you aware of whether there are continuing
4 complaints by Hispanic officers against the Houston
5 Police Department?
6    **A. I think this deposition is reflected of a**
7 **continuing complaint.**
8    Q. So they continue?
9    **A. Complaint continues?**
10    Q. Yes.
11    **A. Sure.**
12    Q. Do you know why Hispanics continue to bring up
13 these disparate treatment and adverse impact cases?
14    **A. No.**
15           MS. DENNIS: Objection, speculation.
16    **A. No.**
17    Q. (By Mr. Zamora) But they keep coming up?
18    **A. Well, there are legal remedies available. If**
19 **you have a complaint, you file an EEOC complaint and we**
20 **go through this process.**
21    Q. Was there a 2001 Department of Justice
22 investigation into HPD practices?
23    **A. What practices?**
24    Q. Let me rephrase the question. Was there a
25 2001 Department of Justice investigation into HPD

MICHAEL DIRDEN - 3/30/2010

69

1 employment practices?
2    **A.  I'm not aware of any.**
3    Q.  But that doesn't mean that an investigation
4 did not take place, right?
5    **A.  I said I was not aware of any.  For the**
6 **relevant period, if the employment practices concerned**
7 **sergeants and lieutenants, then the consent decree**
8 **covers that.**
9    Q.  Do you know if anything has been done in the
10 captain's examination to ensure Hispanics and
11 African-Americans are not disparately treated or
12 adversely impacted?
13    **A.  Yes.  It went to an assessment center process**
14 **and each test is evaluated to make that determination.**
15    Q.  What is the assessment center process?
16    **A.  Assessment center process is a process where**
17 **you have a two-part process where you have a written**
18 **examination to get on the qualifying list, and after**
19 **which, those who successfully pass that process in a**
20 **sufficient number move on to phase two of the process**
21 **which considers an assessment.**
22    Q.  Who participates in the assessment center
23 process?
24    **A.  What do you mean by participate?**
25    Q.  Who is doing the assessment at the assessment

70

1 center?
2    **A.  Who is --**
3    Q.  Who are the participants?
4    **A.  Who are the assessors?**
5    Q.  Yes.
6    **A.  The assessors are professionals in law**
7 **enforcement who are brought in from other cities.**
8    Q.  And I assume the makeup -- the racial makeup
9 of the assessment center varies?
10    **A.  Don't know anything about the racial makeup.**
11    Q.  Is there any requirement that the captain
12 imposes for racial makeup of the assessment center
13 assessors?
14    **A.  The captain is not the person --**
15    Q.  I'm sorry.  The chief.
16    **A.  The chief doesn't select the assessors.**
17    Q.  Who does?
18    **A.  It's done by a contract, an independent --**
19 **pursuant to the meet and confer contract and we select a**
20 **vendor through competitive bidding for selection process**
21 **and the vendor goes forward with that process.**
22    Q.  Okay.  Do you know if the captain's test --
23 the examination has any predictive validity as far as
24 performance in a captain's position?
25    **A.  Yes.**

71

1    Q.  Explain.
2    **A.  Well, in terms of -- not his performance, but**
3 **does the test as administered covers the process as**
4 **administered, covers items that captains are expected to**
5 **demonstrate in terms of ability to do the job, yes.**
6    Q.  Okay.  I want to ask you about some captains
7 who have been promoted and ask you whether the results
8 of this particular captain as I go through them is an
9 indication of the effectiveness of the predictive
10 validity of the captain's examination.  I want to ask
11 you about a Mr. Ready.  Do you know a D.W. Ready?
12    **A.  Yes, I know who he is.**
13    Q.  Who is he?
14    **A.  He's a captain.**
15    Q.  In which division, do you know?
16    **A.  Right now I think he's over human resources.**
17    Q.  Okay.  Are you aware of whether he received a
18 nine-day suspension?
19    **A.  Yes, I am.**
20    Q.  Do you know an M. Ngo?  I can't pronounce that
21 last name.
22    **A.  Matthew Ngo, yes.**
23    Q.  Was he a captain?
24    **A.  Yes, he was.**
25    Q.  Do you know what division?

72

1    **A.  It was one of the patrol stations.  I believe**
2 **it was Clear Lake.**
3    Q.  Do you know whether he was demoted?
4    **A.  Yes, I do.**
5    Q.  Do you know a C. Goralski?
6    **A.  Craig Goralski, yes.**
7    Q.  Who is he?
8    **A.  He's a captain.**
9    Q.  Which division?
10    **A.  Right now he's over special crimes.**
11    Q.  Do you know whether he was considered absent
12 without leave during Hurricane Rita, the mobilization?
13    **A.  Yes, I do know whether or not he was**
14 **considered absent without leave.**
15    Q.  Who is K. Hanes?
16    **A.  Captain Hanes, yes.**
17    Q.  Who is she?
18    **A.  I believe she was a captain.**
19    Q.  Of what unit?
20    **A.  I don't remember what unit.  I think it was**
21 **human resources or recruiting.**
22    Q.  Do you know whether she was considered absent
23 without leave during the mobilization of Hurricane Rita?
24    **A.  Yes, I do.**
25    Q.  Do you know an M.A. Aguirre?

18

MICHAEL DIRDEN - 3/30/2010

73

1    A. Mark Aguirre, yes.
2    Q. Who is he?
3    A. He was a captain.
4    Q. Over what division?
5    A. I think it was called central, his last
6    assignment.
7    Q. Do you know what happened to him?
8    A. I believe he was terminated.
9    Q. And all these are captains that we just
10   discussed, right?
11   A. Yes.
12   Q. Does this show a question of predictive
13   validity of captain's examination?
14   A. Absolutely not.
15   Q. Why not?
16   A. Doesn't show ability to do the job. All it
17   shows is that those captains received discipline or did
18   something that violated department policies. A captain
19   examination is not designed to predict whether or not
20   that anybody would ever violate department policy or be
21   disciplined any more than a lieutenant examination would
22   have done so with your client.
23   Q. Does the exam measure dimensions such as
24   integrity and honesty?
25   A. I don't know what dimensions are measured for

74

1    those assessment processes. Each one measures different
2    things. Depends on each exam and each test.
3    Q. Well, if the discipline history that some
4    captains experience is not predictable, as you
5    mentioned, tell me the purpose of the captain's
6    examination and the assessment.
7    A. The purpose of the assessment is not to
8    determine whether or not anybody will ever face
9    discipline. The purpose of an examination is to have a
10   process where people can compete on an equal footing for
11   promotion to captain. It's not a test of future
12   disciplinary history.
13   Q. But doesn't the successful performance in a
14   captain's position, shouldn't that be measured as part
15   of the captain's examination?
16   A. I think that's what the captain's examination
17   measures, but it doesn't measure whether or not a human
18   is infallible and will never make a mistake.
19   Q. But isn't the exam to predict the successful
20   performance on the job as a captain?
21   A. And I think I testified to that, yes.
22   Q. Do you believe there's enough Hispanic
23   representation in HPD?
24   A. I don't know what enough is. I believe that
25   Hispanics and blacks and whites all have an equal

75

1    opportunity to compete for positions. That's what I
2    believe. What's enough? How do you define enough?
3    Q. Well, I'd go to the general order in which the
4    police department strives to reflect the cultural and
5    ethnic --
6    A. Yes, it does strive, but it doesn't say we
7    will get a particular number. Doesn't describe what
8    enough is. I don't know what enough means.
9    Q. Let me ask you about some captains positions.
10   I want to ask you, are there any Hispanics in the legal
11   services unit in the lieutenant position?
12   A. I don't know.
13   Q. Are there any Hispanic lieutenants in the
14   alternative dispute resolution center?
15   A. Do not know.
16   Q. Are there any Hispanics in the budget and
17   finance division?
18   A. Do not know.
19   Q. Are there any police lieutenants in the public
20   affairs division?
21   A. Do not know.
22   Q. Are there any Hispanics in the internal
23   affairs division?
24   A. Do not know.
25        MS. DENNIS: And I'm going to object as

76

1    vague. You haven't specified if you're talking about
2    currently or during the relevant time period for this
3    lawsuit.
4    Q. (By Mr. Zamora) Okay. Let's talk about 2007
5    specifically, the year 2007. I'll go through them
6    again. Are there any lieutenants in the legal
7    services?
8    A. I have no independent recollection of what
9    occurred in 2007. That was three years ago.
10   Q. Okay. Are you aware of any police lieutenants
11   in the alternative dispute resolution center in 2007?
12   A. I think my testimony is that I don't know
13   what, who was where in 2007.
14   Q. Well, let me ask you, then, from 2007 to the
15   current, tell me whether there are any police
16   lieutenants in the internal affairs section.
17   A. Still have no idea.
18   Q. Are there any police lieutenants from 2007 to
19   2010, the current time, in human resources division?
20   A. Have no idea.
21   Q. Are there any police lieutenants in south
22   central patrol from 2007 to the present?
23   A. Have no idea.
24   Q. Are there any police lieutenants in the Clear
25   Lake patrol from 2007 to 2010, the current?

MICHAEL DIRDEN - 3/30/2010

77

1    A.  I have no idea.
2    Q.  Are there any police lieutenants in west
3  patrol division from 2007 to the present?
4    A.  Have no idea.
5    Q.  Are there any police lieutenants in the
6  homicide division from 2007 to the present?
7    A.  We have a number of lieutenants in the
8  homicide division.
9    Q.  Hispanic lieutenants.
10    A.  Yes.
11    Q.  Who?
12    A.  Humberto Lopez.
13    Q.  Okay.  In auto theft, are there any police
14  lieutenants from 2007 to the present?
15    A.  2007, I don't know.
16    Q.  In the juvenile division, have there been any
17  police lieutenants from 2007 to the present?
18    A.  We have one now.
19    Q.  Who?
20    A.  Can't remember his name, but he was assigned
21  there about a month ago.
22    Q.  You don't recall?
23    A.  I said he was assigned there about a month
24  ago. I don't remember his --
25    Q.  You don't recall the name?

78

1    A.  No.
2    Q.  Tell me if you know when Humberto Lopez --
3  when he was assigned to the police lieutenant position
4  in homicide.
5    A.  Don't know, but he was there when I got there
6  in June of 2007.
7    Q.  Do you know if there were any police
8  lieutenants from 2007 to the present in robbery?
9    A.  Yes.
10    Q.  Any Hispanic police lieutenants?
11    A.  Yes. Elma Trevino.
12    Q.  I'm sorry?
13    A.  Elma Trevino.
14        MS. DENNIS:  What division was that
15  again?
16    A.  Robbery.
17    Q.  (By Mr. Zamora)  Do you know if there were
18  any police lieutenants from 2007 to 2010 -- Hispanic
19  police lieutenants in vice?
20    A.  I do not know whether Charles Vasquez
21  considers himself Hispanic or what. I don't know.
22    Q.  Are you aware if there are any Hispanic police
23  lieutenants in the gang division from 2007 to the
24  present?
25    A.  Do not know.

79

1    Q.  Are you aware if there are any police
2  lieutenants Hispanic in the tactical operations division
3  from 2007 to the present?
4    A.  Don't have a clue.
5    Q.  Special operations?
6    A.  Don't know.
7    Q.  City marshal?
8    A.  Don't know.
9    Q.  Airport police?
10    A.  Don't know.
11    Q.  Patrol operations?
12    A.  I'm sure there are some in patrol operations.
13  I mean, there are approximately 16 to 20 Hispanic
14  lieutenants in the Houston Police Department, so they're
15  assigned to a number of divisions.  Which particular
16  divisions they're assigned to, I don't know.
17    Q.  Office of the inspector general?
18    A.  Don't know.
19    Q.  Okay.  Are you aware of how many police
20  captains there have been from 2007 to the present?
21    A.  You mean how many police captains -- the
22  number of captains have always been the same. We have
23  40 captains.
24    Q.  Forty?
25    A.  We have approximately 40 captains under the

80

1  police department. That's an allocation that's
2  determined by City Council. And my previous testimony
3  is that I believe there are three Hispanic captains.
4  Where they are assigned, I don't know.
5    Q.  Three Hispanic captains?
6    A.  Yes.  That was my previous testimony today.
7    Q.  And I want to refer back to 2007. Do you know
8  how many were Hispanic captains at that time?
9    A.  No.
10    Q.  Okay.  Does Victor Rodriguez -- was he a
11  captain back at that time, do you know?
12    A.  I believe he was a captain at that time.
13    Q.  Do you know when the most recent captain's
14  test was administered?
15    A.  Sometime in the last eight, nine months.
16    Q.  Okay. So 2009?
17    A.  No. Sometime within the last eight or nine
18  months. I don't know exact date, but I do know sometime
19  within that period.
20    Q.  And that would have been 2009, right?
21    A.  I guess. That's my guess. I know it was
22  recent. I know Manny was number eight or number nine or
23  number ten, somewhere in there.
24    Q.  If I said it was August 15, 2006, is when the
25  test was, does that sound right?

20

81

1    A. That would be incorrect.
2    Q. In the test before the most recent one, that
3 would have been August 2006, does that sound right?
4    A. I have no independent recollection of when
5 tests were given.
6    Q. Do you know how many Hispanics were promoted
7 from the last test?
8    A. I have no idea.
9    Q. Do you know how many captains were promoted
10 from the last one?
11    A. No.
12    Q. Can you tell me the names of the assistant
13 chiefs in the Houston Police Department who have never
14 taken a captain's exam?
15    A. No, I can't tell you the names of the
16 assistant chiefs who have never taken a captain's exam
17 other than me.
18    Q. Okay.
19    A. I don't know if the others have ever taken a
20 captain's exam. I was fortunate enough I got promoted
21 to assistant chief before I was eligible to take a
22 captain's exam.
23    Q. Do you know of any other assistant chiefs who
24 have been promoted without being a captain first?
25    A. Yeah, there's a number in the history of the

82

1 department that have been promoted without being a
2 captain.
3    Q. How many in the last ten years?
4    A. Let's see. Phyllis Wunsche, Geraldine
5 Stewart, C.O. Bradford, Jimmy Dodson, Norman Wong, Danny
6 Perales, Dorothy Edwards, John Chen, Michael Dirden.
7 That's all I remember right off the top of my head. Oh,
8 Chuck McClelland, absolutely.
9    Q. Do you believe Lieutenant Zamora is qualified
10 to be a captain?
11    A. Can he do the work? Is that what you're
12 asking me?
13    Q. Can he do the work?
14    A. Can he do the work? Yeah, I think he can
15 probably do the work.
16    Q. Do you think he could excel in doing the work
17 or just meet the minimum standards?
18    A. I think he can probably excel at doing the
19 work.
20    Q. Do you know if he's qualified to be an
21 assistant chief?
22    A. I think those qualifications are fairly easy.
23 The statutory says you have to have -- be a police
24 officer with five years experience in the Houston Police
25 Department, have at least a master's degree and be

83

1 selected by the chief and approved by the mayor.
2    Q. What about the abilities, intellectual
3 abilities, skills?
4    A. Intellectual abilities and skills, I think
5 there are a number of folks who are qualified to be an
6 assistant chief.
7    Q. Would Lieutenant Zamora qualify in your
8 opinion?
9    A. Do he meet the qualifications, yeah.
10    Q. As far as skills and abilities.
11    A. As I said, I think anybody -- I think there
12 are 2,000 people in the Houston Police Department who
13 have the skills and ability to do that job. It's not
14 rocket science.
15    Q. Do you think there's anything that sets
16 Lieutenant Zamora apart from any others?
17    A. In terms of what?
18    Q. In terms of his abilities.
19    A. Abilities to do what?
20    Q. To do the position.
21    A. No. I think he's in the same group with all
22 of us. As I said, there are about 2,000 people who are
23 capable of doing that job.
24    Q. 2,000 just police officers?
25    A. 2,000 folks in the Houston Police Department

84

1 who can do that job, yeah. It's not rocket science.
2    Q. The job isn't?
3    A. No.
4    Q. Is it an easy job?
5    A. No, it's not an easy job, but it's not rocket
6 science.
7    Q. Are there any other alternatives that you
8 think might be able to promote more Hispanics into the
9 command level positions in a more competitive manner?
10    A. I think the method we have -- what do you mean
11 by command level in a more competitive manner? You're
12 saying that we should just promote Hispanics because
13 they're Hispanics?
14    Q. No. I'm just asking if there's any other
15 alternatives to --
16    A. I haven't looked for any alternatives. I
17 think the process we have is a competitive process and
18 it's the competitive process that I have to compete in.
19    Q. Do you think it's the best process?
20    A. I think it's the best process we've used, yes,
21 I do.
22    Q. And yet, there's nothing in your mind that
23 would cause more of a benefit to Hispanic police
24 officers in terms of being able to qualify
25 competitively?

MICHAEL DIRDEN - 3/30/2010

85

1    A.  I don't think we should be gauging our
2  promotional practices to ensure that we promote Hispanic
3  or black or white or any other police officer.  Our
4  promotional practices should be designed to give
5  everybody an equal opportunity to compete, no barriers,
6  hidden, artificial or otherwise.  That's what the
7  selection process is for.  We don't give preferences to
8  people based on race in the Houston Police Department.
9    Q.  Then how do you explain that there's
10 relatively few Hispanics on the police command?
11   A.  You mean relatively few?
12   Q.  Yes.  I mean, you only gave me a handful of
13 captains and assistant chiefs.
14   A.  There's even less blacks.  That means that we
15 haven't competed well in the process and it's incumbent
16 upon us to compete better.
17   Q.  So it's a problem with the Hispanic and
18 African-American situation?
19   A.  No, that's not what I said.
20     MS. DENNIS:  Objection, mischaracterizes
21 the deponent's testimony.
22   A.  I said we haven't competed effectively and we
23 need to compete more effectively.
24   Q.  (By Mr. Zamora)  How can you compete more
25 effectively?  What's the solution?

86

1    A.  Well, the promotional process is an exam in
2  which you study for.  You study, you put the time into
3  it.  Quite frankly, Hispanics have competed extremely
4  well on the recent lieutenant examinations and the
5  research sergeant examinations.  Matter of fact, there
6  are considerably more Hispanic lieutenants and sergeants
7  than African-Americans, so they've competed well.
8    Q.  Why is the command staff not reflective of the
9  community?
10   A.  I think it is reflective of the community.  In
11 Houston, we have blacks, we have whites, we have
12 Hispanics, we have Asians, and all of those are
13 reflected in the command staff.
14   Q.  What about a disparate impact on the process?
15 Do you think there's a disparate impact?
16   A.  I haven't done the analysis to determine
17 whether or not there's a disparate impact.  Disparate
18 impact is only shown by statistical analysis.
19   Q.  And the statistics show that there are
20 relatively few Hispanics at the command level.
21   A.  No.  The question is whether the statistics
22 show disparate impact.  Different question.
23   Q.  Do you believe change in the weight of the
24 assessment center, the written exam and the biography
25 might result in Hispanics competing?

87

1    A.  I have done no analysis of the promotional
2  process.
3    Q.  That's not the question, whether you've done
4  any analysis.
5    A.  Well, in order to form that belief, I would
6  have to do the analysis.
7    Q.  Well, do you have an opinion as to whether or
8  not changing the weight might affect the analysis?
9    A.  I have no opinion.
10   Q.  Do you think changing the appointments to
11 captain based on merit might result in a change in the
12 Hispanic composition at the captain's level?
13   A.  I don't know what you mean by merit, but if
14 you change to make captain an appointed rank?  Is that
15 what you're suggesting?
16   Q.  I'm sorry.  What?
17   A.  Are you saying if you change the captain rank
18 and make it an appointed rank instead of a tested rank?
19 Is that what you're asking?
20   Q.  No.  I'm just talking about appointments in
21 general.
22   A.  Well --
23     MS. DENNIS:  Objection, vague.
24   A.  -- captains are not appointed.  They're
25 tested.

88

1    Q.  (By Mr. Zamora)  It's a promotion.
2    A.  They're tested.
3    Q.  But if you changed some of the aspects or
4  qualifications, such as change the educational
5  requirements or change -- question about whether or not
6  they had any publications or studies that they've
7  performed that are meritorious that would support their
8  advancement to the captain level, accommodations --
9    A.  Only if you can show that what your outside
10 work is relevant to doing the job.
11   Q.  If it's relevant, could that be an important
12 factor?
13   A.  And I think that's my testimony.  If you can
14 show that it is relevant to doing the job and it's
15 something that -- something that you would expect a
16 captain in the Houston Police Department to do.  I don't
17 know that we would expect a captain in the Houston
18 Police Department to do outside research or outside
19 publications or any of those things.
20   Q.  Are there any other alternatives that you can
21 think of to the current system that might enable
22 qualified Hispanics to promote?
23   A.  I haven't given any thought in terms of making
24 qualified Hispanics, black, white or anybody getting
25 promoted.  I don't think that is the purpose of the

89

1    selection process.
2        Q.  Are there any experiences that you believe
3    that might help a lieutenant perform better on a
4    captain's exam?
5        A.  Experiences that help them perform better on a
6    captain's exam?  I think a lot of things could help you
7    perform better on a captain's exam.  The ability to
8    communicate effectively in reading and written and oral
9    form will help you perform better on a captain's exam.
10   To the extent to which you have developed ability to
11   make reason or logical decisions will help you perform
12   better.
13              MS. DENNIS:  Do you need to go off the
14   record?
15              THE WITNESS:  No, that's all right.
16       Q.  (By Mr. Zamora) I'm just wondering, is there
17   anything else you wanted to add to your list?  I have
18   two things.
19       A.  No.  There could be a number of things, but --
20       Q.  Any others that you can --
21       A.  No.
22       Q.  -- think of?
23       A.  Not that jump right out there.
24       Q.  Okay.  I wanted to ask you, did you make any
25   public statements about seven Caucasian lieutenants who

90

1    failed the captain assessment center, but were promoted
2    anyway?
3        A.  Did I make any public statements about --
4        Q.  Yeah.
5        A.  -- failed the assessment process?  The
6    assessment process isn't pass or fail.
7        Q.  But my question is, did you make any public
8    statements --
9        A.  No, I did not.  No.
10       Q.  You did not?
11       A.  No.
12       Q.  Did you make any public statements at all
13   about any Caucasian lieutenants who --
14       A.  No, I did not.
15       Q.  Okay.  Are you aware of the results of a
16   recent survey conducted as to why captains fear speaking
17   up in meetings?
18       A.  No.
19              (Dirden Exhibit No. 7 was marked.)
20              MS. DENNIS:  I'm going to object to this
21   documents in that it has not been produced to the City
22   to date, and also, to its authenticity as I'm not sure
23   who drafted it.  It's not on any official letterhead, no
24   foundation.
25              MR. ZAMORA:  We will rescind the

91

1    document.  Go off the record one last time.
2              (Short break from 4:17 to 4:19 p.m.)
3              MR. ZAMORA:  And just for the record, we
4    will go ahead and identify this document as potential
5    document for discovery, and we'll leave it at that.
6              MS. DENNIS:  Okay.
7              MR. ZAMORA:  And I want to thank you for
8    your time.  Those are all the questions that I have.
9              MS. DENNIS:  And the City reserves its
10   questions for trial.  We will read and sign.
11              (Proceedings concluded at 4:19 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

92

1                    CHANGES AND SIGNATURE
2    PAGE LINE CHANGE                    REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

93

1    I, MICHAEL DIRDEN, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6                MICHAEL DIRDEN
7
8    THE STATE OF          )
9    COUNTY OF             )
10
11    Before me,            , on this day
12    personally appeared MICHAEL DIRDEN, known to me or
13    proved to me on the oath of          or through
14             (description of identity
15    card or other document) to be the person whose name is
16    subscribed to the foregoing instrument and acknowledged
17    to me that he/she executed the same for the purpose and
18    consideration therein expressed.
19       Given under my hand and seal of office on this
20       day of         ,      .
21
22
23              NOTARY PUBLIC IN AND FOR
24                 THE STATE OF
25    My Commission Expires:

94

1    STATE OF TEXAS
2    COUNTY OF HARRIS
3
4            REPORTER'S CERTIFICATE
5       ORAL DEPOSITION OF MICHAEL DIRDEN
6              MARCH 30, 2010
7
8    I, the undersigned Certified Shorthand Reporter in
9    and for the State of Texas, certify that the facts
10   stated in the foregoing pages are true and correct.
11      I further certify that I am neither attorney or
12   counsel for, related to, nor employed by any parties to
13   the action in which this testimony is taken and,
14   further, that I am not a relative or employee of any
15   counsel employed by the parties hereto or financially
16   interested in the action.
17      SUBSCRIBED AND SWORN TO under my hand and seal of
18   office on this the 8th   day of April, 2010.
19
20
21            Julie M. Silhan, Texas CSR 6507
              Expiration: 12/31/11
22            Firm Registration No. 47
              7838 Hillmont
23            Houston, Texas 77040
              713/647-5100
24
25

95

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2            HOUSTON DIVISION
3    MANUEL F. ZAMORA, et al  )
       Plaintiffs       )
4                        )
                         ) C.A. NO. 4:07-CV-4510
       vs.               )
5                        )
       CITY OF HOUSTON and    )
6    HAROLD HURTT, in his    )
       official capacity of   )
7    Police Chief of the City )
       of Houston,        )
8      Defendants         )
9              AFFIDAVIT
10   I, Julie M. Silhan, Certified Shorthand Reporter
     in and for the State of Texas, hereby certify that I
11   was the officer before whom the oral deposition of
     MICHAEL DIRDEN was taken on March 30, 2010.
12
     I do hereby certify that on          ,
13
        The original signature page of the deposition
14      was submitted to         .
15      The original deposition was submitted to
                              for
16      examination and signature.
17      Notification was given to
                         that the original
18      deposition given in the above cause was
        complete and ready for examination and
19      signature at the offices of Carol Davis
        Reporting, Records & Video, Inc., within
20      thirty days of said date.
21      More than thirty days have elapsed since the
        above submission. The original deposition,
22      unsigned, together with all exhibits is being
        forwarded to        on        .
23
        More than thirty days have elapsed since the
24      submission of the original deposition and it
        has not been returned to the offices of Carol
25      Davis Reporting, Records & Video, Inc.

96

1    The original deposition has been signed or the
     original signature page was signed and
2    notarized. The attached page(s) contains
     changes, if any, made by the witness and the
3    reasons therefor. The original deposition
     together with all exhibits is being forwarded
4    to           on
5    That a copy of this Affidavit was served on all
     parties shown herein, pursuant to information
6    made a part of the record at the time said
     testimony was taken.
7
     FOR PLAINTIFF:
8    Mr. Charles Zamora
     Charles Zamora Co., LPA
9    447 East Mound Street
     Columbus, Ohio 43215
10   Telephone: 614/221-1300
     Fax: 614/221-6400
11
     FOR DEFENDANT:
12   Ms. Shani A. Dennis
     City of Houston, Legal Department
13   900 Bagby, 3rd Floor
     Houston, Texas 77002
14   Telephone: 832/393-6300
     Fax: 832/393-6259
15
16
17   SUBSCRIBED AND SWORN TO on this      day of
18     . 2010.
19
20
21          Julie M. Silhan - Texas CSR 6507
            Expiration Date: 12/31/11
22          Firm Registration No. 47
            7838 Hillmont
23          Houston, Texas 77040
            713/647-5100
24
25

1  STATE OF TEXAS

2  COUNTY OF HARRIS

3

4                    **REPORTER'S CERTIFICATE**

5              **ORAL DEPOSITION OF MICHAEL DIRDEN**

6                      **MARCH 30, 2010**

7

8       I, the undersigned Certified Shorthand Reporter in

9  and for the State of Texas, certify that the facts

10  stated in the foregoing pages are true and correct.

11       I further certify that I am neither attorney or

12  counsel for, related to, nor employed by any parties to

13  the action in which this testimony is taken and,

14  further, that I am not a relative or employee of any

15  counsel employed by the parties hereto or financially

16  interested in the action.

17       SUBSCRIBED AND SWORN TO under my hand and seal of

18  office on this the  8th    day of April, 2010.

19

20

21                      Julie M. Silhan, Texas CSR 6507
                        Expiration:  12/31/11
22                      Firm Registration No. 47
                        7838 Hillmont
23                      Houston, Texas   77040
                        713/647-5100
24

25

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

1   STATE OF TEXAS

2   COUNTY OF HARRIS

3

4               **REPORTER'S CERTIFICATE**

5          **ORAL DEPOSITION OF MICHAEL DIRDEN**

6                   **MARCH 30, 2010**

7

8        I, the undersigned Certified Shorthand Reporter in

9   and for the State of Texas, certify that the facts

10  stated in the foregoing pages are true and correct.

11       I further certify that I am neither attorney or

12  counsel for, related to, nor employed by any parties to

13  the action in which this testimony is taken and,

14  further, that I am not a relative or employee of any

15  counsel employed by the parties hereto or financially

16  interested in the action.

17       SUBSCRIBED AND SWORN TO under my hand and seal of

18  office on this the  8th    day of April, 2010.

19

20

21                   Julie M. Silhan, Texas CSR 6507
                     Expiration:  12/31/11
22                   Firm Registration No. 47
                     7838 Hillmont
23                   Houston, Texas  77040
                     713/647-5100
24

25

CAROL DAVIS REPORTING, RECORDS & VIDEO, INC.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3    MANUEL F. ZAMORA, et al    )
           Plaintiffs           )
 4                              )
      vs.                       )  C.A. NO. 4:07-CV-4510
 5                              )
      CITY OF HOUSTON and       )
 6    HAROLD HURTT, in his      )
      official capacity of      )
 7    Police Chief of the City  )
      of Houston,               )
 8         Defendants           )

 9                      AFFIDAVIT

10         I, Julie M. Silhan, Certified Shorthand Reporter
      in and for the State of Texas, hereby certify that I
11    was the officer before whom the oral deposition of
      MICHAEL DIRDEN was taken on March 30, 2010.
12
      I do hereby certify that on _____,
13
      _____   The original signature page of the deposition
14                  was submitted to _____.

15    _____   The original deposition was submitted to
                    _____  for
16                  examination and signature.

17    _____   Notification was given to _____
                                              that the original
18                  _____
                    deposition given in the above cause was
19                  complete and ready for examination and
                    signature at the offices of Carol Davis
20                  Reporting, Records & Video, Inc., within
                    thirty days of said date.

21    _____   More than thirty days have elapsed since the
                    above submission.  The original deposition,
22                  unsigned, together with all exhibits is being
                    forwarded to _____  on _____.
23
      _____   More than thirty days have elapsed since the
24                  submission of the original deposition and it
                    has not been returned to the offices of Carol
25                  Davis Reporting, Records & Video, Inc.
```

1    _____ The original deposition has been signed or the
          original signature page was signed and
2          notarized.  The attached page(s) contains
          changes, if any, made by the witness and the
3          reasons therefor.  The original deposition
          together with all exhibits is being forwarded
4          to _____ on _____.

5    _____ That a copy of this Affidavit was served on all
          parties shown herein, pursuant to information
6          made a part of the record at the time said
          testimony was taken.

7
FOR PLAINTIFF:
8          Mr. Charles Zamora
          Charles Zamora Co., LPA
9          447 East Mound Street
          Columbus, Ohio   43215
10          Telephone: 614/221-1300
          Fax: 614/221-6400

11
FOR DEFENDANT:
12          Ms. Shani A. Dennis
          City of Houston, Legal Department
13          900 Bagby, 3rd Floor
          Houston, Texas   77002
14          Telephone: 832/393-6300
          Fax: 832/393-6259

15

16

17          SUBSCRIBED AND SWORN TO on this _____ day of

18    _____, 2010.

19

20
                              _____
21                              Julie M. Silhan - Texas CSR 6507
                              Expiration Date: 12/31/11
22                              Firm Registration No. 47
                              7838 Hillmont
23                              Houston, Texas   77040
                              713/647-5100
24

25